IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

James M. Bell,                                    )
                                                 )
                          Plaintiff,             )
                                                 )        C.A. No.: 9:06-cv-1095-PMD-RSC
v.                                               )
                                                 )        **ORDER**
Town of Port Royal, South Carolina,              )
a body politic,                                  )
                                                 )
                          Defendant.             )
_____          )

This matter is before the court upon a Motion for Summary Judgment filed by Defendant

Town of Port Royal ("Defendant" or "Port Royal").  For the reasons set forth herein, the court

grants Defendant's motion.

**BACKGROUND**

Plaintiff James M. Bell ("Plaintiff" or "Bell") filed suit against his former employer, the Town

of Port Royal, on April 7, 2006, asserting causes of action for (1) violation of Title VII of the Civil

Rights Act of 1964, as amended, for discrimination in employment on the basis of race; (2) violation

of 42 U.S.C. §§ 1981 and 1983; and (3) violation of the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. § 620.  (*See* Compl.)  Plaintiff, an African-American male, was formerly

employed by the Town of Port Royal as a police officer, and he brings this lawsuit asserting that he

was wrongfully dismissed from his job.  Plaintiff, who was fifty-five at the time of his termination,

asserts he was terminated as a result of age and racial discrimination.  Port Royal, however, contends

that Bell was terminated as a result of his conduct on February 12, 2005.

On February 12, 2005, the Beaufort County Central Dispatch issued a "be on the lookout" for

a maroon car with a broken rear window with a white female driver being beaten by a black male.

Officer Jamie Alberson ("Alberson"), of the Town of Port Royal Police Department, saw the vehicle and was the first to respond; she turned on her blue lights and the vehicle pulled over.[1]  Plaintiff responded immediately after Alberson, and as the Magistrate Judge noted in his Report and Recommendation, it is undisputed that the suspect was thought to be armed and that the stop was considered to be high risk.

Valen Floyd ("Floyd"), the suspect in the car jacking, got out of the maroon vehicle, and the officers then gave him contradictory instructions.  Alberson ordered Floyd to get back into the vehicle, but Plaintiff instructed Floyd to get onto the ground.  Floyd laid down on the ground and dropped the items in his hand while dong so.  A weapon was not among these items.  Plaintiff then crossed in front of the patrol car video and proceeded towards Floyd.

Exactly what happened next is in dispute.  The Town contends that the patrol car video shows Plaintiff intentionally and maliciously stomp twice on Floyd's back and use abusive, inappropriate, and unnecessarily threatening language to a compliant Floyd.  Plaintiff presented evidence that the first time his foot touched Floyd's back occurred when Plaintiff lost his balance and put his foot on Floyd's back in order to stabilize himself.  (Pl.'s Dep. 28:15-28:18.)  Plaintiff also deposed that he put his foot on Floyd's back the second time when he was arresting him.  (Pl.'s Dep. 28:18-28:20.)  According to Plaintiff, the second time he put his foot on Floyd's back was in the course of using the "ground stabilization technique" to keep the suspect still while cuffing him.

After Floyd was restrained and after Floyd told Plaintiff that he "wasn't going anywhere," Plaintiff told Floyd, "I know you're not because I'll blow your _____ing head off if you move another

---

[1]There is a video of the events in question as recorded from the video recorder in Officer Alberson's vehicle.  This video is part of the record.

inch, because I'm crazier than you, do you understand that?"[2]  Bell deposed this language was appropriate given the circumstances.  (Pl.'s Dep. 35:4-35:14.)  Floyd was not injured and did not proceed with any action against Plaintiff.

After the stop, the Beaufort County Sheriff's Department took custody of Floyd and made the arrest.  A deputy sheriff on the scene requested the video of the stop, and although Bell first told Alberson not to give the video to the deputy, he later told her to do so.  According to the Internal Affairs Investigation, Plaintiff stated, "They are going to have to edit that tape first" and "That was my twin brother [on the tape], not me."

Within a day or two of Floyd's arrest, Chief Deputy Mike Hatfield of the Beaufort County Sheriff's Department contacted Captain Roger Karr of the Town of Port Royal Police Department to view the videotape.  After viewing the videotape with Deputy Chief Hatfield, Captain Karr showed it to Chief James Cadien of the Town of Port Royal Police Department.  Chief Cadien then contacted the town manager Van Willis, who watched the video.  Cadien initiated an internal investigation of the incident, and Detective J.H. Griffith, an Internal Affairs officer, conducted that investigation.

Detective Griffith conducted an investigation in which he interviewed Alberson, Plaintiff, Corporals Howard Green and Jeff Merrill of the Beaufort County Sheriff's Office, witnesses Sandra and Robin Whetstone, witness Kim Sibley, and Deputy Cobb of the Beaufort County Sheriff's Office.  Detective Griffith also viewed the videotape, and the report states that Plaintiff's "claim that he had lost his footing and placed his foot on the suspect's back [is] without merit as this claim was obviously refuted by the video tape that clearly shows Lt. Bell forcibly stomp on the suspect's back

---

[2]This passage may not be verbatim, as the court had some difficulty in hearing the audio portion of the tape.

twice." (Pl.'s Resp. in Opp'n Ex. 5 at 8 [49-5].) The report, which is dated February 18, 2005, found that Plaintiff "did act in violation of Departmental Policy by using excessive force" and recommended "that this case be reviewed by the Chief of Police for disciplinary action." (Pl.'s Resp. in Opp'n Ex. 5 at 9 [49-5].)

Cadien reviewed Griffith's report and recommended to Willis that Plaintiff be fired. (Cadien Dep. 24:3-24:7.) Cadien also deposed that he believed Plaintiff's conduct on the tape was not appropriate, and Cadien indicated the tape was the basis for his recommendation to terminate Plaintiff. (Cadien Dep. 100:7-100:12.) According to Cadien, the decision of whether or not to terminate Plaintiff was ultimately made by not by him but by Willis. (Cadien Dep. 103:11-103:13.) Willis deposed that he was "ultimately responsible" for all personnel decisions in the Town of Port Royal. (Willis Dep. 26:24-26:25.) Willis also deposed that he does not always agree with the recommendation of a department head and that in the event of a disagreement, his decision controls. (Willis Dep. 27:10-27:18.)

Plaintiff was terminated on February 25, 2005. The letter from Cadien stated, "As a result of the Internal affairs investigation of the incident of 02/16/2005 [sic] the Police Dept. is here by [sic] terminating your employment with the Town of Port Royal." (Pl.'s Resp. in Opp'n Ex. 1 [49-2].) Bell filed a grievance concerning his termination, and a hearing was held before a grievance committee made up of Town employees. On March 22, 2005, the Employee Grievance Committee sent a memorandum to Willis:

> After viewing the video repeatedly, and reviewing reports provided by both the Police Department and the grieving employee, we, the Grievance Committee, find that we agree with Mr. Bell's explanation of the events, of February 12, 2005. We find that his first step onto the suspect's back was caused by Mr. Bell tripping and trying to regain his balance. We find that the second step onto the suspect's back was not excessive force and was used to gesture where the suspect should place his hands

in order to be handcuffed.

Following deliberation the Town of Port Royal Grievance Committee finds that employee James Bell did not use excessive force during the subject roadside incident of February 12, 2005.  It is the recommendation of the Committee that Mr. Bell be reinstated to his former position and rank.  Further, it is the Committee's recommendation that Mr. Bell receive compensation for his time lost.

We recommend that before making a final decision that you avail yourself of the video tape version of the incident.  We found replaying this media crucial to our decision.  Collectively, we extend to you an invitation to meet with you if you have further questions about our recommendations.

(Pl.'s Resp. in Opp'n Ex. 2 [49-3].)

Although Willis, as the Town Manager, had the ability to reverse his earlier decision to terminate Plaintiff, he declined to do so.  In a letter dated March 25, 2005, Willis indicated that although he was in receipt of the Grievance Committee's recommendation, he did "not suppport[] [its] findings."  (Pl.'s Resp. in Opp'n Ex. 3 [49-4].)  He stated,

This was a particularly difficult decision, considering my respect for Lt. Bell and the length of his service to the Town, but my conclusion is based upon several things:
1.  The force used was excessive.
2.  After repeated viewings, I do not concur with the grievance committee that there was a slip, which was alleged by Lt. Bell as an explanation for the first "stomp" on the suspects [sic] back.
3.  The verbal exchange between Lt. Bell and the suspect was unacceptable and inappropriate.  The explanation for the language is also unacceptable.
4.  Lt. Bell's mention of time-specific stress contradicts his argument that the force used was appropriate.

(Pl.'s Resp. in Opp'n Ex. 3 [49-4].)

After Plaintiff was terminated, a younger white male, Lieutenant Grifffith, was promoted to the position of Lieutenant.  (Griffith Dep. 8:21-9:2.)

Defendant filed a Motion for Summary Judgment on September 17, 2007.  Plaintiff filed a Response in Opposition on October 5, 2007, to which Defendant filed a Reply.  A hearing on the Motion for Summary Judgment was held before Magistrate Judge Carr on October 16, 2007, and he

5

issued a Report and Recommendation ("R&R") on January 30, 2008, in which he recommended granting Defendant's Motion for Summary Judgment. (*See* R&R at 15.) The R&R states,

> This is not a difficult case. Under the standard governing summary judgment, it appears that Plaintiff has established a <u>prima</u> <u>facie</u> case of age and race discrimination because he was performing his job up to the reasonable expectations of his employer up until the incident of February 12, 2005, and he was replaced by a younger white male. However, Plaintiff's claims fail because he has not forecast evidence to rebut Defendant's nonpretextual nondiscriminatory reason for his termination.

(R&R at 13.) Judge Carr noted that Plaintiff argued there were several decision makers and that all of their reasons had to be examined to determine if they were legitimate. (*Id*.) The R&R states,

> Even assuming for purposes of the summary judgment motion that all the above mentioned persons were decision makers, all decision makers' reasons were based upon their undisputed belief that Bell had violated police procedures in the way he conducted Floyd's arrest. Ultimately, because all of the reasons leading up to and at the time of termination amply provide a nondiscriminatory, nonpretextual basis for termination, Plaintiff's attempt to create a genuine issue of material fact where there is none must fail.

(*Id*. at 14.) Magistrate Judge Carr acknowledged that the Town's grievance committee viewed the video tape differently and concluded that such difference of opinion "is of no import," as it is only the decision makers' reasons that are relevant. (*Id*.)

The Magistrate Judge then addressed Plaintiff's argument that his ADEA claim must await determination by a fact finder because "one motivating factor that may have led to his termination may have been his cost to the change the Police Department's retirement system." (Pl.'s Resp. in Opp'n at 28.) Judge Carr stated, "This is Bell's speculative opinion and, as such, does not help to show pretext for illegal age discrimination." (R&R at 14-15.) Judge Carr concluded the R&R by stating, "The pretext analysis does not convert Title VII, the ADEA, or the civil rights statutes into a vehicle for challenging what may be unfair, but nondiscriminatory, employment decisions. (*Id*. at

6

15.)

Plaintiff filed timely objections on February 19, 2008, to which Defendant replied on February 25.

## STANDARD OF REVIEW

**A.    Magistrate Judge's R&R**

This court is charged with conducting a *de novo* review of any portion of the Magistrate Judge's R&R to which a specific objection is registered and may accept, reject, or modify, in whole or in part, the recommendations contained in that R&R.  28 U.S.C. § 636(b)(1).  After a review of the entire record, the R&R, and Plaintiff's objections, the court finds the Magistrate Judge fairly and accurately summarized the facts and applied the correct principles of law.  However, because this court provides additional analysis, the court modifies the R&R and adopts it to the extent it is consistent with this Order.

**B.    Summary Judgment**

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  All evidence should be viewed in the light most favorable to the nonmoving party.  *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).  "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate."  *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "obligation of the nonmoving party 'is particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir. 1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Celotex*, 477 U.S. at 327.

## ANALYSIS

Although Plaintiff's first objection is that the Magistrate Judge erred by not applying a mixed-motive analysis to Plaintiff's case, the court will address Plaintiff's second objection first. Plaintiff's second objection is that the Magistrate Judge erred in recommending this court grant Defendant's Motion for Summary Judgment because he has forecast evidence that would allow a reasonable jury to find for Plaintiff. (Objections at 14.) Plaintiff agrees with the Magistrate Judge's determination that he has established a *prima facie* case of race and age discrimination. Furthermore, Plaintiff stated, "As the Defendant has articulated a legitimate, nondiscriminatory reason for the Plaintiff's termination, the analysis proceeds to the third stage." (*Id.*) Plaintiff thus acknowledges the outcome of this case lies in the third step of the *McDonnell Douglas* framework, stating that he must show "by a preponderance of the evidence, that the Defendant's proffered reason for the dismissal is pretextual or that, if true, was still motivated by illegal discriminatory reasons." (*Id.*) Plaintiff asserts the Magistrate Judge either "overlooked or misapprehended the evidence which would allow a reasonable juror to find that the Defendant's proffered reasons for dismissal were pretextual or motivated by impermissible racial or age considerations." (*Id.* at 14-15.)

8

Although Plaintiff refers to his entire Response in Opposition to Defendant's Motion for Summary Judgment, he specifically points out the evidence he asserts the Magistrate Judge overlooked:

1. The Plaintiff was accused of intentionally using excessive force on Valen Floyd twice when, in fact, the first step was a stumble;

2. The second step with the placement of the Plaintiff's foot on Valen Floyd's back was consistent with training and procedure taught to police officers when effecting a felony arrest. It is also consistent with the Defendant's own Rules and Regulations. (Exh. 11). This is supported by the expert opinion of Samuel D. Faulkner.

3. The internal affairs investigation report prepared by Det. Griffith is riddled with inaccuracies and untrue statements.

4. The Plaintiff was subject to a secret investigation only nine months before the Plaintiff was terminated for excessive force.

5. The Plaintiff was treated more harshly as compared to Officer Bilyard and Capt. Karr with respect to claims of use of force and excessive force.

6. The Plaintiff was treated more harshly with respect to the use of improper language when both Capt. Karr and [Officer] Alberson used language that was far more inappropriate than the Plaintiff's use of language.

(Objections at 15-16 (citations omitted).)

The question for this court is thus whether Plaintiff has presented sufficient evidence such that a reasonable jury could conclude Plaintiff was terminated because of his age and/or his race. In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), the question before the Court was "whether a defendant is entitled to judgment as a matter of law when the plaintiff's case consists exclusively of a prima facie case of discrimination and sufficient evidence for the trier of fact to disbelieve the defendant's legitimate, nondiscriminatory explanation for its action." *Reeves*, 530 U.S. at 137. Because the parties did not dispute it, the Court assumed the *McDonnell Douglas* framework applied to the plaintiff's ADEA claim. *Id.* at 142. In *Reeves*, it was undisputed that the plaintiff established a *prima facie* case because when he was fired, he was over forty years old; he was otherwise qualified for his position; he was discharged by the defendant; and the defendant hired

three persons under forty to fill the plaintiff's position. *Id*. The burden then shifted to the defendant to produce evidence that it fired the plaintiff for a legitimate, nondiscriminatory reason. *Id*. The defendant "met this burden by offering admissible evidence sufficient for the trier of fact to conclude that [plaintiff] was fired because of his failure to maintain accurate attendance records." *Id*. The Court then explained the final part of the analysis:

> Although the intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. And in attempting to satisfy this burden, the plaintiff–once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision–must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence. Moreover, although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and the inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual.

*Id*. at 143 (internal quotation marks and citations omitted).

In *Reeves*, the evidence supporting the defendant's explanation for the plaintiff's discharge was that the plaintiff engaged in "shoddy record keeping." *Id*. The Court noted, however, that the plaintiff "made a substantial showing that [the defendant's] explanation was false:" the plaintiff (1) presented evidence that he properly maintained attendance records and (2) cast doubt on whether he was responsible for a failure to discipline late and absent employees. *Id*. at 144-45. The court of appeals concluded there was insufficient evidence to sustain the jury's finding of liability, and the Court noted the "Court of Appeals proceeded from the assumption that a prima facie case of discrimination, combined with sufficient evidence for the trier of fact to disbelieve the defendant's legitimate, nondiscriminatory reason for its decision, is insufficient as a matter of law to sustain a

10

jury's finding of intentional discrimination." *Id*. at 146. In so doing, however, the Court of Appeals erred:

> [T]he Court of Appeals misconceived the evidentiary burden borne by plaintiffs who attempt to prove intentional discrimination through indirect evidence. This much is evident from our decision in *St. Mary's Honor Center*. There we held that the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not *compel* judgment for the plaintiff. The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not establish that the plaintiff's proffered reason is correct. In other words, it is not enough to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.
>
> In reaching this conclusion, however, we reasoned that it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. Specifically, we stated:
>> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.

*Id*. at 146-47 (internal quotation marks and citations omitted) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)).

The Court was careful to note that a plaintiff's showing that the proffered nondiscriminatory reason was untrue will not always be sufficient to sustain a jury's finding of liability. *Id*. at 148. The Court stated,

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. . . .
>
> Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima

> facie case, the probative value of the proof that the employer's explanation is false,
> and any other evidence that supports the employer's case and that properly may be
> considered on a motion for judgment as a matter of law.

*Id*. at 148-49.  In *Reeves*, the Court concluded the district court was correct to send the case to the

jury because the plaintiff "established a prima facie case of discrimination, introduced enough

evidence for the jury to reject [the defendant's] explanation, and produced additional evidence of age-

based animus."  *Id*. at 153-54.  This additional evidence consisted of the plaintiff's testimony that

Chesnut, the director of manufacturing, told him he "was so old [he] must have come over on the

Mayflower" and, when the plaintiff was having difficulty with a machine, that the plaintiff "was too

damn old to do [his] job."  *Id*. at 151.  There was also testimony from another employee that there

was an "obvious difference" in how Chesnut treated that younger employee and the plaintiff.  *Id*.

In the case *sub judice*, Plaintiff has presented evidence that the first step was a stumble and

that he stepped on Floyd's back a second time in order to safely arrest Floyd, and this evidence must

be credited in ruling on Defendant's Motion for Summary Judgment.  Assuming these facts, however,

changes nothing about the decision makers' view that Plaintiff used excessive force.  In *Holland v.*

*Washington Homes, Inc.*, 487 F.3d 208 (4th Cir. 2007), the plaintiff brought suit alleging his

employment was terminated because of his race and complaints of discrimination.  The district court

granted the employer's motion for summary judgment, and the plaintiff employee appealed.  *Holland*,

487 F.3d at 210.  The parties agreed Holland had made out a prima facie case of discrimination.  *Id*.

at 214.  The defendant met its burden of production to show a legitimate, nondiscriminatory reason

for the plaintiff's termination: the plaintiff was fired because DeCesaris, defendant's president,

"believed that Holland made threats" toward his boss, Peck.  *Id*.  The burden thus shifted back to the

plaintiff to prove this stated reason was a pretext for discrimination.  *Id*.  The court found the plaintiff

12

could not meet that burden:

> Unfortunately for [plaintiff], he has not put forth sufficient evidence showing that [defendant's] proffered legitimate explanation was false. Aside from his denials as to the threats (which we accept as true), nothing in the record supports an inference that . . . [the] explanation was pretextual, or perhaps more on point, that [the decision maker] did not believe that [plaintiff] had threatened [his coworker] when he made the decision to fire him.

*Id.* at 215; *see also DAG Petroleum Suppliers, LLC v. BP PLC*, No. 06-2070, 2008 WL 193193, at *6 (4th Cir. Jan. 23, 2008) (unpublished) ("[I]n this context, pretext is a lie or cover-up, not merely a mistake. Therefore, evidence that BP erroneously or even purposely misapplied its own policy, will not suffice to overcome summary judgment. . . . DAG contends that a jury could deduce that its July 6th bid was the most lucrative offer on the table when it was eliminated from the auction . . . Even if a jury were to view DAG's bid as superior, this would suggest nothing more than the possibility that BP made an unsound business decision. . . . DAG must provide sufficient evidence for a jury to find not that DAG's bid *could* be considered superior, but that BP *did conclude* as much and rejected DAG's bid nonetheless." (internal quotation marks and citations omitted)).

Even crediting Plaintiff's assertion that he first stepped on Floyd's back to regain his balance and then stepped on his back a second time as part of effectuating Floyd's arrest, doing so does not cast doubt upon the decision makers' view that Plaintiff used excessive force. Furthermore, as the Magistrate Judge noted in the R&R, while Port Royal's Grievance Committee did not believe Plaintiff used excessive force and recommended he be reinstated, it is the decision makers' reasons for concluding that Plaintiff should be terminated that are at issue in this case. *See, e.g., King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (noting that the plaintiff's testimony that he was performing in a satisfactory manner and his coworkers' testimony that the plaintiff's lesson plans were substantially comparable to their own does not provide evidence that the plaintiff was meeting

the defendant's legitimate performance expectations); *see also Kess v. Municipal Employees Credit Union of Baltimore, Inc.*, 319 F. Supp. 2d 637, 648 (D. Md. 2004) ("'It is the perception of the decision maker which is relevant to the question of retaliation, not the opinions of . . . co-workers or other third parties.'" (quoting *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir. 1998)). Indeed, as in *Holland*, Plaintiff's explanations about the incident do not cast doubt upon the decision makers' view of the incident. *See Holland*, 487 F.3d at 215.

The other evidence Plaintiff points to is evidence that he was the subject of a secret investigation in May of 2004. There was an allegation that Plaintiff, while off-duty, improperly went into someone's house. (Griffith Dep. 51:19-52:6.) Griffith deposed that he investigated this allegation but never spoke with Plaintiff about it. (Griffith Dep. 50:22-51:16.) When asked why he did not speak with Plaintiff, Griffith deposed that the investigation did not proceed because he could not get a statement from the complainant, and the complainant was not even present at the time of the incident in question. (Griffith Dep. 52:17-53:1.) He further stated,

> Well, again, I was unable to get all the facts because–Based on what I did get, had it carried forward I still wouldn't have seen any real issue because allegedly one person that was there said that they allowed him to come in the house. So it's not like he violated their fourth amendment rights or anything by illegal search or seizure.

(Griffith Dep. 53:17-53:23.)

Plaintiff asserts this evidence is evidence of pretext because it shows he was subject to increased surveillance. In *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 921 (11th Cir. 1993), the Eleventh Circuit stated,

> Appellant introduced evidence that prior to the filing of his complaints, he regularly received above average performance evaluations. Immediately preceding and following his filing of his administrative complaints, however, Appellant received numerous unfavorable performance evaluations and was subject to increased scrutiny and harassment from his supervisors. If proven at trial, such incidents would bear on

14

the pretext issue. *See B. Schlei & P. Grossman*, *Employment Discrimination Law* 554
(2d ed. 1983) (noting that surveillance "strongly suggests the possibility of a search
for a pretextual basis for discipline, which in turn suggests that subsequent discipline
was for purposes of retaliation").

*See also EEOC v. Mental Health Authority of St. Mary's, Inc.*, No. DKC 2006-2554, 2008 WL 53254, at * (D. Md. Jan. 2, 2008) ("This evidence of a desire to terminate, increased scrutiny, and an unwillingness to indicate how the employee could avoid termination, when taken in conjunction with evidence of a plan to terminate that arose shortly after the employee complained of racial discrimination in the workplace, was sufficient to bar the entry of summary judgment for the employer.").

The problem with this evidence for Plaintiff is that it does not in fact show Plaintiff was subject to increased scrutiny. Griffith was investigating a 911 call that alleged Plaintiff had been in someone's house illegally. (Griffith Dep. 54:14-54:17.) Plaintiff makes much of the fact that this investigation was secret, and it is not disputed that Plaintiff was unaware of the investigation. However, Griffith deposed that neither Captain Karr nor Chief Cadien instructed him not to talk to Plaintiff about the investigation. (Griffith Dep. 58:15:58:20.) Rather, Griffith indicated that the investigation did not proceed because he could not get a statement from the complainant. (Griffith Dep. 52:17-52:23; 54:3-54:4.)

Plaintiff next asserts he was treated more harshly as compared to Officer Bilyard and Capt. Karr with respect to claims of use of force and excessive force. On or about May 27, 2003, Elaine Green filed a complaint against Officer Bilyard, alleging he had used excessive force on her fourteen year old daughter when he grabbed her twice, twisted her arm behind her back, and placed her in handcuffs. (Resp. in Opp'n Ex. 29 [49-30].) Detective Griffith, at the request of Captain Karr, investigated the allegation of the use of excessive force, and Griffith wrote a memorandum to Chief

15

Cadien dated June 2, 2003, in which Griffith indicated that he could not substantiate the report of excessive force made against Officer Bilyard, concluding that "after reviewing the incident, CPL Bilyard was in compliance with all standard operating procedures currently in effect." (*Id*.) According to Plaintiff,

> Unlike his investigation of Lt. Bell, Det. Griffith did not obtain any written statements from the witnesses or even the involved parties. In fact, Det. Griffith did not even interview the child or her mother to determine if there were any bruises on her wrists or arms. The qualify of the investigation of Officer Bilyard assured that there would be no finding that Officer Bilyard had engaged in excessive force.

(Resp. in Opp'n at 25-26.)

Plaintiff also points to an allegation of a threat of force made by Captain Karr. (*See* Resp. in Opp'n Ex. 27 [49-28].) It appears that on or about July 6, 1998, Larry Byers, who was then separated from his wife, noticed a phone number on the cell phone bill which belonged to a pager, and Mr. Byers called it. (*Id*.) The suspect, Captain Karr, called back, and Mr. Byers asked Captain Karr if he was dating Mr. Byers' wife, and Karr replied "that he would shoot [Mr. Byers] and dispose of the body where nobody would find it." (*Id*.) The Incident Report indicated that "the investigation will be turned over to Chief Cadien of the Port Royal Police" Department. (*Id*.) It appears that at some point, Chief Cadien went to Mr. Byers' home to discuss the incident. (Karr Dep. 90:24-91:4.) Karr also deposed that he did not remember there being an internal affairs investigation. (Karr Dep. 91:16-91:20.) According to Plaintiff, the evidence shows that

> Chief Cadien did not institute any kind of internal investigation of the incident. Even though Capt. Karr was alleged to have threatened the life of another man, the matter was simply dropped. However, when Chief Cadien and Capt. Karr heard of a possible domestic incident involving Lt. Bell, they instituted a "secret" internal investigation of Lt. Bell.

(Resp. in Opp'n at 25.)

16

The plaintiff in *Murray v. City of Sapulpa*, 45 F.3d 1417 (10th Cir. 1995), made a similar argument. The plaintiff Murray, an African American man who was a police officer, was terminated based upon findings that he had illegally disposed of the alleged crack cocaine after the arrest of a juvenile suspect and for illegally using a hand gun. *Murray*, 45 F.3d at 1420. The plaintiff Weaver, a white man, worked for the city as a police officer, and during a drug arrest, Weaver had a physical altercation with the suspect. *Id*. After the suspect had been arrested and handcuffed, he spit in Weaver's face, and in response, Weaver struck the suspect on the head with a flashlight. *Id*. In his suit against the city, Weaver asserted he was terminated in retaliation for supporting his friend and co-worker, Murray, but the city articulated a legitimate, nondiscriminatory reason for his termination: he violated local rules and regulations. *Id*. at 1421. In arguing that he was truly terminated for supporting his friend Murray, Weaver cited two incidents in which other police officers used excessive force and were not disciplined. *Id*. In the first incident, an officer struck a combative prisoner, who was handcuffed to a gurney, in the head in response to a bite on the arm. *Id*. The second officer resigned before any discipline could be taken, and "[t]he first officer responded to a physical attack by a combative prisoner." *Id*. However, the prisoner Weaver struck had spit at him but not harmed him. *Id*. The Tenth Circuit concluded the evidence was insufficient to support the inference that the police department's reason for discharging Weaver was improper because "the incidents offered by Mr. Weaver to show disparate treatment are factually dissimilar to Weaver's conduct and the consequences thereof." *Id*.

Plaintiff's evidence does not create a genuine issue of material fact regarding whether the Defendant's legitimate, nondiscriminatory reason for terminating Plaintiff was a pretext for his age and/or race. Officer Bilyard was investigated, and it was found that he did not use excessive force.

While Plaintiff asserts the investigation was not conducted as thoroughly as the "secret" investigation against him, such is mere speculation on Plaintiff's part and is not sufficient evidence to survive Defendant's Motion for Summary Judgment. *See Holland*, 487 F.3d at 217 ("[A]lthough a reasonable trier of fact would conclude that [the defendant] reported a different reason and date, when combined with the company's innocuous reasoning for these decisions and [plaintiff's] failure to present any other evidence–beyond baseless speculation–that . . . [the] stated reason was pretextual, the trier of fact would be hard-pressed to conclude that this established pretext."); *see also Guseh v. N.C. Cent. Univ.*, 423 F. Supp. 2d 550, 556 (M.D.N.C. 2005) ("Plaintiff must come forward with admissible evidence that is more than self-serving opinions or speculation."); *Middlebrooks v. Univ. of Md. at College Park*, 980 F. Supp. 824, 831 (D. Md. 1997) ("'Speculation and belief are insufficient to create a fact issue as to pretext . . . .'" (quoting *Baldwin v. Univ. of Tex. Med. Branch at Galveston*, 945 F. Supp. 1022, 1032 (S.D. Tex. 1996))).  Furthermore, while it appears that Captain Karr was not subjected to an internal investigation for his alleged threat against Mr. Byers, such fact does not cast doubt upon Defendant's assertion that it fired Plaintiff for using excessive force.  In addition, while Captain Karr's alleged conduct involved the threat of force, it did not involve the use of force.

Plaintiff also asserts he has evidence of pretext in that he was treated more harshly with respect to the use of improper language when both Capt. Karr and [Officer] Alberson used language that was far more inappropriate than the Plaintiff's use of language.  On or about January 22, 2003, a witness accused Captain Karr of harassment because Karr stated, during municipal court, "That was a nasty bitch."  (Resp. in Opp'n Ex. 30 [49-31].)  Willis found that Karr's language violated the Police Department's non-discrimination and anti-harassment policy, and a letter was placed in

18

Captain Karr's file indicating that such language would not be tolerated in the future. (*Id.*) On August 8, 2006, Officer Alberson was disciplined for violating the policy governing employee use of the mobile data computer, in that she used vulgar language and discriminatory remarks. (Resp. in Opp'n Ex. 31 [49-32].) Plaintiff states, "As a result of this violation involving vulgar language, Officer Alberson received only an oral reprimand." (Resp. in Opp'n at 27.) However, it appears Alberson received an oral warning as well as a written reprimand. (*See* Resp. in Opp'n Ex. 31 [49-32].) While Defendant asserts Plaintiff was terminated, in part, because of his abusive language, and Captain Karr and Officer Alberson were only reprimanded, the conduct of the three individuals is not comparable. Neither the conduct of Captain Karr nor Officer Alberson involved a threat, and they were in fact reprimanded.

Thus, while the Magistrate Judge did not specifically refer to this evidence, the court finds that even considering it, no reasonable jury could find that Defendant terminated Plaintiff because of his race and/or age. Plaintiff's assertions that he lost his balance and then stepped on Floyd's back as part of proper arrest procedure, even if true, do not cast doubt upon whether the decision makers believed Plaintiff's conduct violated the Police Department's rules and procedures. Furthermore, while Plaintiff asserts he presents evidence that Captain Karr and Officer Bilyard were treated differently with respect to allegations of improper use of force, Captain Karr's conduct involved the threat of force, not the use of it, and Officer Bilyard was in fact investigated but found not to have violated the Police Department's policies. Lastly, while both Captain Karr and Officer Alberson used improper language in violation of the Police Department procedures, they were disciplined, and neither incident involved the use of force. The court concludes there is nothing in the record to create a genuine issue of material fact regarding whether Defendant's proffered reason for terminating

Plaintiff was pretextual.[3]

Plaintiff's first objection is that the Magistrate Judge erred by not applying a mixed motive analysis to Plaintiff's case. (Objections at 9.) Plaintiff noted the Magistrate Judge "appropriately" found that he established a *prima facie* case of race and age discrimination, and Plaintiff also noted the Magistrate Judge found the employer articulated a legitimate nondiscriminatory basis for its actions. (*Id*. at 10.) Plaintiff continues,

> The Magistrate Judge ruled against the Plaintiff, however, on the Third step that the Plaintiff had "not forecast evidence to rebut the Defendant's nonpretextual nondiscriminatory reason for his termination." (Report and Recommendation, p. 13.) The Magistrate Judge decided the case solely on the <u>McDonnell Douglas</u> single motive framework and ignored any mixed-motive analysis which is warranted by the facts of this case.

(*Id*.) Plaintiff asserts such a failure is error because under the mixed-motive theory, he is not required to prove the sole reason he was terminated was because of his age or race; rather, he can proceed to trial even if the Defendant's reason for termination is true "as long as the plaintiff can show that race or age was still a motivating factor." (*Id*.)

In *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277 (4th Cir. 2004), the plaintiff brought suit against her former employer claiming wrongful termination on the basis of her sex and age and in retaliation for her complaints of such discrimination. *See Hill*, 354 F.3d at 281.

---

[3]Plaintiff's fourth objection is that the Magistrate Judge erred in concluding the court was asked to arbitrate mere differences of opinion between an employer and an employee. (Objections at 17.) While Plaintiff acknowledges that an employer's use of unwise criteria in making personnel decisions does not amount to illegal discrimination, he asserts this proposition does "not express the full scope of the inquiry." (*Id*.) Plaintiff again asserts he has presented sufficient evidence to show that the reasons given for the Plaintiff's termination were not the true reasons. (*Id*. at 18.) However, as addressed herein, the court concludes a reasonable jury could not conclude the Defendant's proffered reasons for terminating Plaintiff were a pretext for discrimination. The court finds this objection to be without merit.

The court noted that "[g]enerally speaking, a plaintiff may avert summary judgment and establish a claim for intentional sex or age discrimination through two avenues of proof." *Id*. at 284. First, a plaintiff may establish a claim of discrimination by "demonstrating through direct or circumstantial evidence that sex or age discrimination motivated the employer's adverse employment decision." *Id*. In order to prevail, however, it is not necessary that the employee demonstrate the prohibited characteristic was the sole motivating factor; the plaintiff need only prove that it was a "motivating factor." *Id*. The court noted that the courts previously held, even after Congress added § 2000e-2(m) to Title VII, that a plaintiff had to produce direct evidence to establish a mixed-motive discrimination case. *Id*. However, after the decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003), the Court held that no such "heightened showing through direct evidence" is required. *See Hill*, 354 F.3d at 285. Thus, a Title VII plaintiff need only demonstrate that an employer "used a forbidden consideration with respect to any employment practice." *Desert Palace*, 539 U.S. at 98; *Hill*, 354 F.3d at 285. The court then recognized the "pretext" framework of *McDonnell Douglas* was the second method of averting summary judgment in a discrimination case. *Hill*, 354 F.3d at 285.

In his Response in Opposition to Defendant's Motion for Summary Judgment, Plaintiff indicated that he was proceeding under both the mixed-motive method set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), *abrogated on other grounds by Desert Palace*, 539 U.S. 90, and the pretext method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). It is curious that given Plaintiff's argument, there is no mention in the Report and Recommendation of a mixed-motive theory at all.

In discussing Plaintiff's ADEA claim, the R&R states, "In the absence of direct evidence of age discrimination, as here, courts analyze age discrimination claims under the same burden-shifting

21

framework used to resolve other employment discrimination cases." (R&R at 4.) Although this issue does not appear to be definitively settled, in *Laber v. Harvey*, 438 F.3d 404 (4th Cir. 2006), the Fourth Circuit stated, "We apply the familiar *McDonnell Douglas* burden-shifting framework to resolve claims of age discrimination when the plaintiff produces no direct or circumstantial evidence of discrimination sufficient to warrant a 'mixed-motive' analysis." *Laber*, 438 F.3d at 430. Furthermore, in *Mereish v. Walker*, 359 F.3d 330 (4th Cir. 2004), the Fourth Circuit stated,

> We have not had occasion to decide whether the mixed-motive provision under the Civil Rights Act of 1991 applies to the ADEA. We have previously expressed doubt that it does, and instead we have suggested that the *Price Waterhouse* framework still applies to ADEA claims. *See, e.g., Hill*, 354 F.3d 277, 284 n.2. This is in large part because, when Congress enacted the Civil Rights Act of 1991 in response to *Price Waterhouse*, it amended only Title VII and did not pass a corresponding amendment to the ADEA. And maintaining the higher evidentiary burden in *Price Waterhouse* for ADEA claims is not implausible, given that age is often correlated with perfectly legitimate, non-discriminatory employment decisions.

*Mereish*, 359 F.3d at 340; *see also E.E.O.C. v. Warfield-Rohr Casket Co.*, 364 F.3d 160, 164 n.1 (4th Cir. 2004) (noting that the court has previously assumed, without deciding, "that direct evidence is still a prerequisite for a mixed-motive analysis in ADEA cases"); *Ruff v. Target Stores, Inc.*, 226 Fed. App'x 294, 304 (4th Cir. 2007) (declining the appellant's "invitation" to extend the *Desert Palace* holding "that direct evidence is not required in Title VII mixed-motive cases–to age-discrimination claims"). As the Magistrate Judge properly noted, there is no direct evidence of age discrimination in the case *sub judice*. Accordingly, there was no error in the Magistrate Judge's failure to analyze Plaintiff's ADEA claim under the mixed-motive theory.[4]

In assessing Plaintiff's Title VII claim, the Magistrate Judge did not mention a mixed-motive

---

[4]However, even under a mixed-motive analysis, Defendant is still entitled to summary judgment on Plaintiff's ADEA claim.

analysis. While this omission does not alter the outcome of the case, the court finds such an omission troubling. Pursuant to *Hill*, a Title VII plaintiff may proceed under the mixed-motive theory, and he is no longer required to present direct evidence of discrimination in order to proceed under this theory. *See Hill*, 354 F.3d at 284-85. However, even with the elimination of "any heightened requirement of direct evidence," a plaintiff must still prove that the protected trait motivated the employer's decision. *Id*. at 286. The Fourth Circuit in *Hill* stated,

> Regardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext), or whether she proceeds under a mixed-motive or single-motive theory, the ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination. To demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based upon a protected trait must produce sufficient evidence upon which one could find that the protected trait actually motivated the employer's decision. The protected trait must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.

*Id*. (internal quotation marks and citations omitted). As discussed above, Plaintiff is unable to make such a showing. Plaintiff is thus not entitled to proceed with his case pursuant to the mixed-motive theory.

Plaintiff's third objection is that the Magistrate Judge erred in finding that Van Willis made the ultimate decision to terminate Plaintiff. (Objections at 16.) Plaintiff states that he has shown that Chief Cadien and Captain Karr were the actual decision makers. (*Id*. at 17.) Plaintiff states,

> Chief Cadien, in his letter of termination to the Plaintiff, stated that he, on behalf of the Police Department, was terminating the Plaintiff. Van Willis, in his letter rejecting the recommendation of the Grievance Committee, stated that he concurred with the decision to terminate the Plaintiff. The preponderance of the evidence establishes that Det. Griffith, Capt. Karr and Chief Cadien were the actual decision makers and Van Willis was the "rubber stamp." At a minimum, the decision of who is the real decision maker is a question that should be submitted to the jury.

(*Id*.)

23

Contrary to Plaintiff's assertion, however, the Magistrate Judge made no such error. The R&R states,

> Here, the plaintiff contends that there were several decision makers in addition to Willis including Griffith, Cadien and Karr and, therefore, all decision makers reasons must be examined to determine if they are legitimate. Even assuming for purposes of the summary judgment motion that all of the above mentioned persons were decision makers, all decision makers' reasons were based upon their undisputed belief that Bell had violated police procedures in the way he conducted Floyd's arrest. Ultimately, because all of the reasons leading up to and at the time of termination amply provide a nondiscriminatory, nonpretextual basis for termination, Plaintiff's attempt to create a genuine issue of material fact when there is none must fail.

(R&R at 13-14.) The court agrees with the Magistrate Judge. Regardless of whether the decision maker was Willis, Griffith, Cadien, or Karr, the legitimate, nondiscriminatory reason proffered for Plaintiff's termination is the same, and Plaintiff's objection is without merit.

Plaintiff further objects to the Magistrate Judge's recommendation that Plaintiff's claims pursuant to 42 U.S.C. § 1981 and § 1983 be dismissed. (Objections at 18.) Plaintiff states, "For the reasons stated above [in the Objections], the Plaintiff's § 1981 and § 1983 claims should not be dismissed as they relate to the Plaintiff's race discrimination claims." (*Id.*) Because the court has determined that Plaintiff's Title VII claims are subject to summary judgment, Plaintiff's objection is without merit. *See Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253 (2001) (analyzing the plaintiffs' § 1981 claim under the *McDonnell Douglas* framework); *see also Gairola v. Commonwealth of Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985) ("Under Title VII and either § 1981 or § 1983, the elements of the required prima facie case are the same."); *Middlebrooks v. Univ. of Md.*, 166 F.3d 1209 (4th Cir. 1999) (unpublished table decision) (analyzing the plaintiff's § 1981 and § 1983 claims under the Title VII proof scheme as articulated in *McDonnell Douglas*).

24

Plaintiff's final objection is that the Magistrate Judge erred in dismissing the Plaintiff's third cause of action alleging infringement of the Plaintiff's constitutionally protected liberty interests. (Objections at 18.) Plaintiff asserts that the Magistrate Judge erred in recommending dismissal of Plaintiff's entire Complaint because neither the Defendant, in its Motion for Summary Judgment, nor the Magistrate Judge, in his R&R, addressed Plaintiff's third cause of action. (*Id.*) Plaintiff states, "As this issue was not raised by the Defendant or addressed by the Magistrate Judge, it should not be included as part of the Magistrate Judge's Report and Recommendation on the Defendant's Motion for Summary Judgment." (*Id.* at 19.)

In Plaintiff's third cause of action, he alleges the Defendant filed a Misconduct Report form with the South Carolina Criminal Justice Academy which indicated Plaintiff was terminated as a result of the following misconduct:

> (i) the repeated use of excessive force in dealing with the public and/or prisoners;
> (ii) dangerous and/or unsafe practices involving firearms, weapons and/or vehicle which indicate either a wilful or wanton disregard for the safety of persons or properties; and
> (iii) physical or psychological abuses of members of the public and/or prisoners.

(Compl. ¶ 31.) Plaintiff alleges these statements made to the South Carolina Criminal Justice Academy were false and that he "has been denied a meaningful opportunity to clear his name, either by way of a pre-termination hearing or post-termination hearing." (Compl. ¶¶ 32, 35.) Plaintiff asserts these actions "deprived Plaintiff of rights, privileges and immunities provided by the United States Constitution and laws and deprived Plaintiff of his liberty and property without due process of law." (Compl. ¶ 36.) His third cause of action thus alleges a violation of 42 U.S.C. § 1983. (Compl. ¶ 37.)

Because neither party argued this cause of action in the Motion for Summary Judgment or the

Response in Opposition, the court ordered the parties to brief the issues. Defendant filed its Memorandum on March 24, 2008, and Plaintiff filed his Memorandum on April 8, 2008. Defendant first argues summary judgment is appropriate on this cause of action because Plaintiff failed to allege a liberty interest was violated by the Town of Port Royal; Defendant states, "Plaintiff neither alleged nor set forth any evidence that would indicate . . . the alleged 'false statements' were disclosed publicly." (Def.'s Mem. at 4.) Defendant asserts that it was required to complete the form at issue pursuant to state regulations and that it was required to be kept confidential. (*Id*.) Defendant then argues that "[e]ven assuming this court determined the filing of the form by Port Royal with the [South Carolina Criminal Justice] Academy violated the Plaintiff's liberty interests," the fact that Plaintiff had the right to file a response to the form with the Academy "satisfies the requirement that Plaintiff be given notice of the statements and an opportunity to clear his name." (*Id*. at 5.) Defendant's third argument is that summary judgment is appropriate because Plaintiff "was given ample opportunity to give his side of the story and effectively 'clear his name' at a hearing before the Town of Port Royal Grievance Committee." (*Id*. at 5-6.)

Defendant further argues the court should grant its Motion for Summary Judgment because Plaintiff cannot prove the statements contained in the misconduct report are false. (*Id*. at 6.) In addition, Defendant argues that Officer Karr's actions "would be protected from liability under the doctrine of qualified immunity for claims of a violation of constitutional rights under 42 U.S.C. § 1983." (*Id*. at 7.) Defendant states, "There is no evidence in the record that would indicate Karr in completing the misconduct form acted with malicious intention to deprive the Plaintiff of his constitutional rights. . . . This Defendant has been unable to locate any precedential opinion which has held that a governmental employer's reporting information confidentially to a regulatory body

26

invokes a violation of the constitutionally protected right to liberty." (*Id*. at 8.)  Defendant further argues the Town of Port Royal cannot be held liable because "[n]o . . . policy, custom, etc. has been alleged by the Plaintiff in this action," and "it has not been alleged or proven that Karr is a policy-maker for the Town of Port Royal sufficient to invoke liability." (*Id*. at 9.)

The Due Process Clause of the Fourteenth Amendment "reduces unfair or mistaken deprivations of individual interests by commanding states to provide persons in jeopardy of loss with certain procedural safeguards." *Mallette v. Arlington County Employees' Supplemental Retirement Sys.*, 91 F.3d 630, 634 (4th Cir. 1996).  The Due Process Clause calls for two separate inquiries in evaluating an alleged procedural due process violation: "First, did the plaintiff lose something that fits into one of the three protected categories: life, liberty, or property?  And, if so, did the plaintiff receive the minimum measure of procedural protection warranted under the circumstances?" *Id.* (citing *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982)).  In the case *sub judice*, it appears Plaintiff argues his liberty interest was infringed.  (*See* Pl.'s Mem. at 2.)  The Supreme Court has indicated a constitutionally protected liberty interest protected by the Due Process Clause arises when an employer, in the course of terminating a public employee, creates and disseminates a false and defamatory impression about the employee in connection with his discharge which might seriously damage his standing and associations in the community or deprive him of future opportunity for employment within his profession. *See Roth*, 408 U.S. at 573-75.

Both parties cite *Sciolino v. City of Newport News, Virginia*, 480 F.3d 642 (4th Cir. 2007). In that case, a former city police officer brought a § 1983 suit, alleging that when discharging him, the city "placed in his personnel file false information damaging to his good name without granting

him a name-clearing hearing, and so deprived him of liberty rights without due process of law." *Sciolino*, 480 F.3d at 644-45. The plaintiff was hired in May of 2002 as a police officer, and he was placed on an eighteen-month probationary period. *Id*. at 645. During that period, the chief of police, acting on behalf of the police department, terminated the plaintiff's employment by letter, "accusing him of deliberately destroying city property by advancing the odometer" on the police car. *Id*. The plaintiff alleged the department placed this letter into his personnel file. *Id*. The plaintiff brought action against the City of Newport News and the chief of police, but the district court granted the defendants' motion to dismiss, concluding "a plaintiff must allege facts asserting that damaging and false charges in his personnel file were likely to be disseminated to prospective employers or members of the public." *Id*. After dismissal, the plaintiff moved to file a second amended complaint, but the district court denied the motion. *Id*.

On appeal, the plaintiff argued the city deprived him of his Fourteenth Amendment liberty interests without granting him a name-clearing hearing. *Id*. "To state this type of liberty interest claim under the Due Process Clause, a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." *Id*. at 646 (citing *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 n.5 (4th Cir. 1988)). The element at issue in that case was the second one, and the court concluded the district court did not abuse its discretion in dismissing the plaintiff's first amended complaint because "in order to state a claim under the Due Process Clause, a plaintiff must allege a likelihood that prospective employers will inspect his personnel file." *Id*. at 645. The court rejected the city's contention that a plaintiff must allege a specific instance of actual dissemination. *Id*. at 649. The Fourth Circuit stated,

28

> In situations like that at hand, the constitutional harm is not in the defamation itself; rather, it is the denial of a hearing at which the dismissed employee has an opportunity to refute the public charge. If an allegation of actual dissemination were required, the information would have already been communicated to a potential employer, the employee's job opportunities foreclosed, and his reputation damaged *before* any possibility for a name-clearing hearing.

*Id*. (internal quotation marks and citations omitted). A plaintiff can demonstrate the likelihood that prospective employers or the public at large will inspect the file in two ways: (1) "the employee could allege (and ultimately prove) that his former employer has a practice of releasing personnel files to all inquiring employers;" or (2) "the employee could allege that although his former employer releases personnel files only to certain inquiring employers, that he intends to apply to at least one of these employers." *Id*. at 650. The court concluded that because the plaintiff's complaint alleged only that his file with the charges "may be available to prospective employers," the district court properly dismissed the complaint. *Id*.

Even though the district court properly dismissed the complaint, the Fourth Circuit concluded the district court abused its discretion in denying the plaintiff's motion to amend his complaint. *Id*. at 651. The plaintiff wanted to amend his complaint to allege that it was the practice of the police department to disseminate former employees' personnel files to local and regional police departments. *Id*. The Fourth Circuit thus concluded the plaintiff should have been allowed to amend his complaint. *Id*.

The court must first determine whether Plaintiff presented sufficient evidence of a violation of his liberty interest in order to survive Defendant's Motion for Summary Judgment. In the case *sub judice*, Defendant argues it is entitled to summary judgment because it never publicly disclosed the allegedly false statements and because the statements contained therein were true. Considering the evidence in the light most favorable to Plaintiff, he has presented some evidence that he did not use

excessive force: he presented evidence that the first "stomp" was a stumble and that the second "stomp" was part of proper police procedure. Having viewed the tape of the traffic stop, it is the court's opinion that reasonable minds could differ as to whether these "stomps" were intentional and malicious, as Defendant asserts, or whether they were in fact accidental, as Plaintiff asserts. While the court noted in assessing Plaintiff's Title VII and ADEA claim that there was no evidence the decision makers' stated reasons for terminating Plaintiff were false, the court assumed Plaintiff's version of the events was true. There is thus conflicting evidence concerning whether Plaintiff actually used excessive force in arresting Valen Floyd and thus conflicting evidence regarding whether the statements contained in the Misconduct Form were actually true.

A more difficult question is whether there is any evidence that Defendant made the charges against Plaintiff public. Defendant, Town of Port Royal, made one disclosure: Defendant sent the Misconduct Form to the South Carolina Criminal Justice Academy. South Carolina Regulations provide,

> A. All law enforcement agencies and other employers of law enforcement officers are required to notify the Department [of Public Safety] when an officer leaves the employment of the agency/employer, regardless of the reason for the separation within 15 days of separation.
> B. Such notification shall take place on a form as prescribed by the Department, contain the facts and circumstances leading to the separation, and be for the Department's confidential use and subsequent safekeeping.
> C. In the event that such notification contains allegations of misconduct, a copy of such notice shall be sent to the law enforcement officer and the officer shall be informed of the provisions of Section 23-6-460 and allowed to file a response for the Department's use and safekeeping.
> D. A willful failure by law enforcement agencies and other employers of law enforcement officers to supply the facts and circumstances of separation shall subject the violator to a civil penalty as provided by law.

S.C. CODE ANN. REGS. § 38-009.[5]  A similar issue arose in *Young v. Annarino*, 123 F. Supp. 2d 915 (W.D.N.C. 2000).  In that case, the plaintiff Edwards argued that disclosures made by Lunsford, an Internal Affairs Officer for the Asheville Police Department, to Slagle, a field representative of the North Carolina Criminal Justice Education and Training Standards Commission, constituted defamation which deprived him of his protected liberty interest not to have his reputation harmed. *Young*, 123 F. Supp. 2d at 924.  As a result of the investigation conducted by Slagle, Edwards' certification as a law enforcement officer was terminated.  *Id*.

The court in *Young* noted that law enforcement agencies in North Carolina were required to complete a "Report of Separation" within ten days of an officer's resignation or dismissal and forward it to the Criminal Justice Standards Division.  *Id*.  "This form was forwarded by the Defendants and it triggered Slagle's investigation."  *Id*.  The court concluded that "[t]he report itself violated no constitutional rights."  *Id*.  The plaintiff, however, argued that disclosures made to Slagle concerning alleged sexual misconduct did violate his constitutional rights.  *Id*.  The United States District Court for the Western District of North Carolina rejected this argument, stating,

---

[5]Defendant brings to the court's attention South Carolina Code § 23-6-460, which has since been repealed.  This section stated,

> An oral or written report, document, statement, or other communication that is written, made, or delivered concerning the requirements or administration of this chapter or regulations promulgated under it must not be the subject of or basis for an action at law or in equity for slander or libel in any court of the State if the communication is between:
>> (1) a law enforcement agency, its agents, employees, or representatives; and
>> (2) the department or the advisory council, its agents, employees, or representatives.

This section, while effective at the time Defendant sent the Misconduct Report Form to the South Carolina Criminal Justice Academy, does not alter the court's analysis as by its terms it is not applicable to the instant § 1983 action.

Where a state agency *publicly* and falsely accuses a discharged employee of dishonesty, immorality or job related misconduct, considerations of due process demand that the employee be afforded a hearing in order to have an opportunity to refute the accusation and remove the stigma upon his reputation. The information provided here was placed in Slagle's Investigative Memorandum; thus, it is questionable that any public disclosure was made. The *Wuchte* court declined to reach this issue, disposing of the case on other grounds. However, the Supreme Court has held that when the reasons for terminating an employee are disclosed at a meeting with the employee but never publicly disclosed, no liberty interest is implicated. *Bishop v. Wood*, 426 U.S. 341, 348 (1976). "Unpublicized accusations do not infringe constitutional liberty interests because, by definition, they cannot harm 'good name, reputation, honor, or integrity.'" *Hodge v. Jones*, 31 F.3d 157, 165 (4th Cir. 1994). Nor does the fact that the Defendants "publicized" the information to the commission constitute publication. *Id.* (Where the information reported to the DSS was required to be kept confidential, no publication occurred.); *Watson v. Lowcountry Red Cross*, 974 F.2d 482, 487-88 (4th Cir. 1992) (Remote possibility of public disclosure of confidential medical records does not rise to level of constitutional privacy violation.).

Moreover, the incidents of which Edwards complains were noted in Slagle's report as unsubstantiated. He thus has not shown that the termination of his certification was caused by that information, rather than his termination as an officer. And while he may no longer work in law enforcement, he is not foreclosed from other employment opportunities. *See, e.g., Jackson v. Long*, 102 F.3d 722, 730 (4th Cir. 1996). Ths undersigned therefore agrees with the Magistrate Judge's determination that Plaintiff Edwards has no claim for the violation of a protected liberty interest in his reputation.

*Id.* at 925 (some internal quotation marks and citations omitted).

Other courts have concluded similar disclosures do not violate a protected liberty interest. *See, e.g., Hannon v. Turnage*, 892 F.2d 653, 660 (7th Cir. 1990) (rejecting an argument that the VA deprived the plaintiff of a liberty interest when it provided the reason for his dismissal to the Office of Personnel Management stating that "except when interagency sharing of information stigmatizes the plaintiff throughout the federal government, there is generally no abridgement of a liberty interest when the government circulates information among a limited number of agencies for a specified purpose."); *Doe v. Cheney*, 885 F.2d 898, 910 (D.C. Cir. 1989) (rejecting Doe's liberty interest claim because the National Security Administration "did not disseminate publicly any of the information

that it used in making its decision vis-a-vis Doe.  By contrast, NSA disclosed the information only to other federal agencies with whom NSA tried to place Doe, with Doe's consent.  Restricted disclosure of such material to other federal agencies, with clear limits on further distribution, is not stigmatizing and does not infringe upon constitutional liberty interests."); *Luy v. Baltimore Police Dep't*, 326 F. Supp.2d 682, 690-91 (D. Md. 2004) (concluding the plaintiff failed to state a claim for deprivation of a protected liberty interest because the plaintiff did not "allege that these statements were 'made public by his employer,' except through internal communications to [Baltimore Police Department] employees and in submissions to the [Maryland Department of Labor, Licensing and Regulation] pursuant to [the plaintiff's] request for unemployment benefits, and these disclosures are not sufficient").

While Plaintiff asserts the information was publicly disclosed, the only disclosure made by the Town of Port Royal was the disclosure to the South Carolina Criminal Justice Academy, a disclosure it was required to make pursuant to South Carolina law.  The court concludes this disclosure was not a public one.  According to Plaintiff, however, this Misconduct Report Form is made available to the public and can be obtained by a Freedom of Information Act request.  (Pl.'s Br. at 2-3.)  Defendant's response to this assertion is that these documents should not have been made public and that the Town has a "right to rely on the Academy's own regulation which provides that these documents will be maintained confidentially."  (Def.'s Reply Br. at 2.)  Defendant states, "Quite simply, the Town could not have known that the documents were going to be made public[;] therefore, it did not know the Plaintiff's rights could be violated."  (*Id*.)  Defendant also asserts the court should not consider these documents because Plaintiff did not present these documents during discovery.  (*Id*.)  The court agrees with Defendant that it should not be held liable on a § 1983 cause

33

of action for following a rule requiring reporting to the Academy when failure to do so would subject the Defendant to civil penalties. Moreover, while there is some evidence that the information was made public in the form of a Freedom of Information Act request, it was not the Town of Port Royal making that dissemination.

Furthermore, even if the court were to conclude that Plaintiff can establish the violation of a liberty interest, the next step in the inquiry would be whether the plaintiff received the minimum measure of procedural protection warranted under the circumstances. In the context of a *property* interest in employment, the Supreme Court stated,

> An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case. We have described "the root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." This principle requires some kind of hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)) (other internal quotation marks and citations omitted). In a footnote, however, the Court noted that "[t]here are . . . some situations in which a postdeprivation hearing will satisfy due process requirements." *Id.* at 542 n.7 (citing *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594 (1950); *N. Amer. Cold Storage Co. v. Chicago*, 211 U.S. 306 (1908)). Such situations are generally emergency situations, however, in which "some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Roth*, 408 U.S. at 570 n.7.

Based on the record before the court, it does not appear the Plaintiff was provided with a pre-termination hearing. Plaintiff was terminated on February 25, 2005, the same day Captain Karr signed the Misconduct Report Form that was sent to the South Carolina Criminal Justice Academy.

34

While a pre-termination hearing may be required in the context of property interests, it does not necessarily follow that such a requirement exists in the context of liberty interests. "In cases where a liberty interest arising from reputational damage is implicated, the courts have followed a different procedural course. The hearings granted in such cases serve not to avert the unjustified denial of a specific benefit, but to allow the aggrieved party to clear his name." *Buxton v. City of Plant City, Fla.*, 871 F.2d 1037, 1046 (11th Cir. 1989). In the Eleventh Circuit, "[b]ecause [a name-clearing hearing] is provided simply to cleanse the reputation of the claimant, the hearing need not take place prior to his termination or to the publication of related information adverse to his interests." *Id*. Several circuits have reached a similar conclusion. *See Rankin v. Indep. Sch. Dist. No. I-13, Noble County, Okla.*, 876 F.2d 838, 842 (10th Cir. 1989) (noting that a name-clearing hearing may be constitutionally adequate even if it occurs after the public dissemination of reasons for dismissal); *White v. Thomas*, 660 F.2d 680, 684-85 (5th Cir. 1981) (stating that a post-termination hearing was the proper remedy for an employee deprived of a liberty interest during termination); *Rodriguez de Quinonez v. Perez*, 596 F.2d 486, 490-91 (1st Cir. 1979) (concluding a pre-termination hearing was not required but a post-termination hearing was necessary in a case involving a liberty interest). The Eighth Circuit, however, has concluded that *Loudermill* implies that a pre-termination name-clearing hearing may be required in the context of a liberty interest claim. *See Schleck v. Ramsey County*, 939 F.2d 638, 642 n.5 (8th Cir. 1991).

Examining the arguments and the evidence in the record, the court concludes Plaintiff's Due Process rights were not violated. First, the court notes that pursuant to South Carolina Regulations, Plaintiff had the right to respond to the Misconduct Report Form in the form of a letter. *See* S.C.

CODE ANN. REGS. § 38-009.[6]  Furthermore, although not all courts agree, this court concludes that a pre-termination hearing is not necessarily required in the context of a violation of a liberty interest. While the court has found no Fourth Circuit authority on this issue, the court is persuaded by the reasoning of the Eleventh Circuit.  *See Campbell v. Pierce County, Ga.*, 741 F.2d 1342, 1345 (11th Cir. 1984) ("Because it is provided simply to cleanse the reputation of the claimant, the hearing need not take place prior to his termination or to the publication of related information adverse to his interests."). Plaintiff had the benefit of a post-termination hearing, and the court concludes such a hearing satisfies the requirements of the Due Process Clause.  Indeed, given the recommendation of the Town of Port Royal's Grievance Committee, it appears Plaintiff did in fact clear his name.[7]

---

[6]Plaintiff argues this post-termination hearing was not sufficient because he only submitted evidence on the charges of misconduct relating to the arrest of Valen Floyd, as he did not have notice of the other charges.  He states, "Other than the Valen Floyd matter, the Plaintiff has not had a hearing to clear his name."  (Pl.'s Br. at 7.)  A notation on the Misconduct Report Form indicates a letter was mailed on June 3, 2005, and it appears this is the date a letter was mailed to the Plaintiff (as there would be no need to mail a letter to the Town, who initially submitted the form, and the notation indicates this date is when the South Carolina Criminal Justice Academy received the address).  There is no evidence or any allegation that Plaintiff ever responded to this letter.

If Plaintiff had no notice of the charges against him (other than the Floyd arrest) prior to or during his post-termination hearing, the case becomes much closer with respect to these claims.  However, the court concludes that Plaintiff's claim cannot stand against this Defendant, as Defendant's filing of a required form with the South Carolina Criminal Justice Academy did not violate Plaintiff's due process rights.

[7]Although both parties make additional arguments, one final point is worth mentioning. Defendant argues it cannot be held liable under § 1983 because it is a municipality and because Plaintiff has not alleged any policy or custom in this action.  (Def.'s Br. at 8-9.)  Pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), a municipality cannot be held liable under § 1983 on a respondeat superior theory.  *Monell*, 436 U.S. at 691.  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.  Defendant argues no policy or custom has been alleged in the case *sub judice*.  (Def.'s Br. at 9.)  Defendant also asserts that "it has not been alleged or proven that Karr is a policy-maker for the Town of

## CONCLUSION

It is therefore **ORDERED**, for the foregoing reasons, that Defendant's Motion for Summary Judgment is **GRANTED**.

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**April 21, 2008**

---

Port Royal sufficient to invoke liability." (*Id.*)  Having concluded that Plaintiff received due process of law, the court declines to reach the issue of municipal liability.